IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES,

    Plaintiff,	No.  CR-S-11-0210 JAM (GGH)

    vs.

VERA KUZMENKO,

    Defendant.
_____/

*Introduction and Summary*

      The United States (government) has brought this action against defendant Vera Kuzmenko (Kuzmenko), and others, on account of a massive real estate fraud assertedly orchestrated by Kuzmenko.  The government opposes pre-trial release of Kuzmenko because of its belief that large amounts of money, generated by the fraud, are outstanding and available making her a flight risk.  The government additionally believes that persons willing to assist Kuzmenko in posting security for bond are tainted themselves with the fraud, although the properties finally proffered appear not to be directly tied to any allegations.

      For the reasons that follow, the undersigned will order release conditioned upon the posting of secured bond in the amount of $500,000, electronic monitoring, and the remainder

1

of conditions set forth in the Supplemental Pretrial Services Report of July 28, 2011. One-half of the security to be posted shall be in the form of liquid assets, a corporate surety bond, or both.

*Background*

  The indictment, filed May 12, 2011, alleged that Kuzmenko has committed wire fraud, mail fraud, money laundering and witness tampering. In simple terms, the scheme involved the "usual allegations" – a defendant obtaining real estate commissions by submitting grossly fraudulent loan applications to those entities funding the real estate loan – with a substantial, added twist. The twist involved Kuzmenko targeting distressed (upside down) properties with straw purchasers, in which the seller agreed that upon sale only the mortgage would be paid off.[1] However, the actual sale price submitted to the loan companies (and hence the loan amounts approved by the lending institutions) was inflated by several mechanisms. For example, Kuzmenko is alleged to have manufactured "gain" by submitting to the loan company false invoices for purported work that the seller had performed on the property prior to close of escrow, and which were to be paid to shell companies from any proceeds received on the sale. Ostensibly, the value of the house for appraisal purposes was artificially enhanced by the work performed. In reality, no pre-sale work was ever performed, and the entities listed on the invoices were shell companies run by persons who would profit together with Kuzmenko for the non-existent work.[2] Fraudulent documentation of many types was submitted to the lending institutions to convince the lenders that the straw purchasers met the requirements for loans on the sale price. Ultimately, of course, the lenders were forced to foreclose on the property at great loss to the lender. The government alleges the lending institutions' loss at over $9,000,000.

\\\\

---

[1] A distressed seller might well find that appealing in that the seller could walk away from a distressed property with no bad mark on his or her credit and be able to make a fresh start.

[2] It may also be the case that the government is alleging that the appraisals supplied to the lending institutions were also inflated *per se* regardless of any work purportedly performed.

*Detention Proceedings*

Kuzmenko was arrested on a complaint and made her first appearance on May 3, 2011. Detention proceedings were continued several times with the first detention hearing being held on May 12, 2011. Kuzmenko was ordered detained by the undersigned based on then unanswered questions about an international flight she had been scheduled to take a day after her arrest, unaccountable, significant sums of money, and inadequate proffered security. She had her first bail review before the Honorable Dale Drozd which was unsuccessful because of inadequate proffered security and lingering questions about unaccounted for monies, including an alleged million or so dollars in a Swiss bank account.

On July 29, 2011, Kuzmenko appeared once more before the undersigned for a second bail review, proffering security for a $300,000 plus bail package, but persistent questions about the Swiss bank account, as well as the nature of the security for the proffered bond, necessitated an evidentiary hearing held on August 1, 2011. The undersigned took the matter under submission at that hearing.

*Discussion*

Flight risk is the only issue in this detention proceeding.[3] The law regarding the government's burden of proof in establishing flight risk is well established. The government bears the burden by a preponderance of the evidence showing that no conditions or combination of conditions will reasonably assure the appearance of defendant. United States v. Gebro, 948 F.2d 1118, 1121 (9th Cir. 1991). The undersigned is mindful that it should ensure that defendants are not unnecessarily detained, and that incarceration should be reserved, if possible, *post-conviction*. Bona fide doubts about the propriety of release should be resolved in favor of the defendant. Id. Thus, the undersigned turns to the facts.

\\\\

---

[3] The underlying charged offenses do not trigger a danger to the community analysis. See United States v. Gill, 2008 WL 2120069 *3 (E.D. Cal. 2008).

3

First, the undersigned cannot specifically credit the existence of a Swiss bank account with the approximate sum of $1,000,000. According to the agent, this "fact" was transmitted to the government by informants, one of whom overheard Kuzmenko tell of this bank account. The other informant was much more general about a bank account with monies in it. However, the government chose not to reveal the informants' identities, and therefore, the undersigned cannot credit the hearsay. While hearsay can be utilized in a detention proceeding, United States v. Winsor, 785 F.2d 755, 756 (9th Cir. 1986), the hearsay must be reliable. In order to assess reliability, a defendant has the right to at least know who the declarant may be in order to mount any attack on the declarant's credibility or foundation.

However, the larger issue of unaccounted for monies which could be used to fund flight remains. The government has produced persuasive evidence that the fraud alleged in the indictment, for which the grand jury has found probable cause, produced large amounts of ill gotten monies, most of which appear to be outstanding. While it is not clear who may hold the majority of such funds, or where there may be precisely located, these facts do not detract from the fact that funds for flight wherever held may exist for this defendant. First, Kuzmenko was the indicted ringleader of this fraud; it stands to reason that she would have maintained the bulk of monies obtained as a result of the schemes described above. Secondly, the undersigned notes that the description of the fraudulent scheme reveals participants, both indicted and unindicted, in an ethnically close knit group, some might say financially incestuous, who have such loyalty to each other that holding of another's assets may well be performed on a matter of trust. This fact increases the difficulty of ascertaining the precise whereabouts of liquid assets, but lends some credence to the possibility of their remaining existence.

While at first very problematic, Kuzmenko's on-the-eve-of-arrest aborted international trip to the Ukraine for an alleged medical procedure has been largely explained by the defense. Evidently, this scheduled round trip to the Ukraine and back was halted on account of Kuzmenko not being able to obtain a visa. The defense has produced credible information that

the trip was cancelled by Kuzmenko, just prior to her arrest.  Although the Ukraine is proximate to Estonia, there are no facts suggesting that the purpose of the Ukraine trip was simply a ruse to ultimately go back to the country in which she grew up, or a nearby country.[4]

The above fact of unaccounted for monies significantly supports the government's request for detention.  However, there are facts which weigh in favor of fashioning release conditions.  As pointed out by defense counsel, Kuzmenko is a citizen of no country, having given up her USSR citizenship in 1988.[5]  She is a permanent legal resident in the United States, and has a seven year old daughter residing with her in this country.  Allegedly, she has no immediate family in foreign countries.

Kuzmenko has much support within her community, perhaps a bit too much as alluded to above.  Nevertheless, associates of Kuzmenko have stepped forward pledging security for bond which itself does not appear to be tainted with fraud, although it is not clear the extent to which some of the persons proffering security were unindicted participants in the scheme alleged in the indictment.  The amount of security pledged is in excess of $300,000.  Normally, this amount would be quite sufficient to deter flight, although the government references again the unaccounted for monies and the possibility that such monies could repay anyone who lost security because of defendant's flight.

Kuzmenko has one prior conviction in 1994 for felony insurance fraud for which she received a short amount of jail time.  Her proclivity to misrepresent does not assist her in this detention matter, i.e, it becomes more difficult to accept her promises to appear or abide by

---

[4] Defense counsel argued that Kuzmenko would not flee to a country within which she could not speak the language.  The Ukraine and Estonia were former states within the USSR where Russian is a well understood language.  Because Kuzmenko lived in Estonia and because she was a school aide assisting Russian students, one can infer that she speaks fluent Russian.

[5] Kuzmenko was born in Uzbekistan when it was a province/republic within the USSR. She early on moved to Estonia, and finally came to the United States in 1988.  According to Kuzmenko, she has no close family in either Estonia or Uzbekistan, family members having emigrated to the United States.

conditions of release.  Neither does the nature of the witness tampering charge weigh in her favor.

Although weight of the evidence is the least important factor, Winsor, 785 F.2d at 757, common sense requires the conclusion that the greater the realistic penalty, the more likely it is that one would have incentive to flee if the evidence weighs against her.  The specificity of the indictment, and the probable lack of legitimate explanation for the multiple actions described therein, as well as the evidence heard by the undersigned at evidentiary hearing, bespeak that the government has much weighty evidence in this case.  And a very rough Guidelines computation, utilizing § 2B1.1, would indicate a realistic penalty in the neighborhood of ten years actual incarceration.  If witness tampering were proved, this might result in an additional consecutive penalty.  This factor weighs against Kuzmenko.

Especially given the real possibility of funds unaccounted for, the undersigned does not find that the present security proffered is adequate in amount to deter flight.  However, the undersigned ultimately concludes weighing all the circumstances that a bond in the amount of $500,000 sufficiently addresses the risk of flight.  The security posted shall be comprised of at least one-half in liquid assets, a corporate security bond, or both.  The remainder may consist of liens on real property having equity or other valuable property.  All of the remaining conditions set forth in the July 28, 2011 Supplemental Pretrial Services Report, including electronic monitoring, shall be imposed as well.

*Conclusion*

Defendant Vera Kuzmenko will be ordered released on the conditions as set forth above.  No release order will be signed until all bonds are filed and security posted.  Defendant must read and execute the Notice to Defendant Upon Being Released.  Pretrial Services shall endeavor to have electronic monitoring up and running at the time security is posted.

DATED: August 3, 2011

                     /s/ Gregory G. Hollows
                   UNITED STATES MAGISTRATE JUDGE